UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

_____

MARK ALLEN TODD,

       Plaintiff,

v.


MIDWEST MOTORS SALES & SERVICE INC.,
DONALD J. MILLER, and,
ERIC R. RITTENHOUSE,

       Defendants.

_____/


**COMPLAINT and JURY DEMAND**

**I. Introduction**

    1.  Defendant Midwest Motors Sales & Service, Inc. ("Midwest Motors" or "Midwest"), (www.midwestmotorsonline.com) sells motor vehicles to consumers in credit transactions, using retail installment sales contracts.

    2.  A typical credit transaction is initiated when a Midwest Motors employee helps the consumer complete a simple credit application.  Midwest then obtains the consumer's credit report.  Midwest Motors then attempts *via* the internet, fax or other means to obtain the tentative approval of an investment company that specializes in purchasing motor vehicle retail installment sales contracts to purchase the contract from Midwest Motors and "fund" the deal.  Funding usually takes place pursuant to pre-

1

existing agreements between Midwest and various investment companies. These
agreements state the terms under which each investment company will purchase
contracts from Midwest Motors. The preliminary arrangement of the investment
company to purchase a particular contract from Midwest Motors is merely conditional
and will specify additional terms ("stipulations") which must be met before the
investment company will actually purchase the contract from Midwest Motors. Typical
stipulations include a subsequent telephone interview of the consumer by an employee
of the investment company, and verification of the consumer's residency, employment
and income.

3. Once Midwest Motors has received an investment company's tentative
approval to purchase the contract, Midwest tells the consumer that he/she has been
"approved for financing". If the consumer agrees to purchase a vehicle, a Midwest
Motors employee prepares the retail installment sales contract and other form-
documents related to the transaction. The consumer signs the documents, thereby
becomes the vehicle's owner, and takes delivery of the vehicle.

4. Problems occur when Midwest Motors later finds itself unable to satisfy all of
the stipulations required by the investment company and the investment company
refuses to purchase the contract from Midwest. Although Midwest's contract with the
consumer contains no lawful provision conditioning the sale of the vehicle and
Midwest's extension of credit upon Midwest's subsequent sale of the contract, Midwest
sometimes will refuse to hold the retail installment sales contract and honor Midwest's
contract with the consumer, which results in an illegal "spot delivery" or "yo-yo"
transaction. Midwest may then coerce the consumer into providing additional

2

paperwork, may require the consumer to provide a co-borrower, or may require the consumer to sign additional contracts on different terms.  Alternatively or eventually, Midwest will breach the contract and demand that the consumer return the vehicle to Midwest, sometimes falsely accusing the consumer of stealing the vehicle or threatening to file a false police report and improperly involve law enforcement. Ultimately, Midwest will unlawfully repossess or convert the consumer's vehicle.

5.  In a widely distribute May 22, 1989 Opinion Letter, the Michigan Department of Commerce, Financial Institutions Bureau stated that in the Bureau's opinion, it is unlawful for a motor vehicle installment seller to condition a sale on the seller's subsequent success in selling the retail installment contract to a third party purchaser of the contract.  The State of Michigan on its website continues to make the letter available to consumers at:

http://www.michigan.gov/documents/cis_ofis_spotdel_24239_7.pdf.

6.  The State of Michigan also warns consumers about spot delivery, stating: "[T]he dealer has the choice whether to assign the contract.  The dealer has sole control over the effort it will make to assign a contract. . . . A motor vehicle installment sale contract conditioned upon the contract's assignment to a finance company violates the [Motor Vehicle Sales Finance Act].  Such a provision is not enforceable. . . . [T]he contract is not void.  It is legally enforceable.  You are still responsible for making the payments as required by the contract.  If the dealer requests that you return to sign a new contract, you are not required to do so."  The State of Michigan makes this consumer protection warning at:

http://www.michigan.gov/documents/cis_ofis_spotdeli_23752_7.pdf.

7.   Similarly, the Michigan Secretary of State Dealer Manual, § 3-3.4. states that "a finance contract is between the purchaser and the dealer.  Typically, the dealer assigns the Motor Vehicle Installment Sales Contract to a finance company and then places a lien on the vehicle's title to secure payment.  If the finance company subsequently rejects the loan contract after interest in the vehicle transfers to the purchaser, it becomes the dealer's responsibility to offer financing to the purchaser under the same terms (e.g., interest rate, payment schedule, etc.) as the original finance contract.  This may require that the purchaser make the payments directly to the dealer"  The manual expressly warns: *"It is a violation of state law to attempt 'repossession' of a vehicle after delivery or to change the terms of the finance contract if a finance company refuses the contract after a spot delivery."*  The Michigan Secretary of State Dealer Manual is available at:

http://www.michigan.gov/documents/sos/Dealer_Manual_Chapter_3_186402_7.pdf.

8.   Plaintiff Mark Allen Todd is a victim of Midwest's unlawful spot delivery/yo-yo practices.  Many state and federal laws may be violated when a car dealer engages in this most unfair and deceptive practice.  Midwest Motors has violated the federal Truth in Lending Act, 15 U.S.C. § 1638, *et seq.*, the federal Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.,* the federal Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.,* the federal Motor Vehicle Information and Costs Savings Act, 49 U.S.C., § 32701, *et seq.,* and its regulations, 49 C.F.R. § 580.1, *et seq.*  Midwest violated Michigan's Motor Vehicle Installment Sales Contract Act, M.C.L. § 566.301, *et seq.,* and Michigan's Conversion Statute, M.C.L. § 600.2919a, as well as breaching its contract with Mr.

4

Todd, and harming him in other ways.

**II Jurisdiction and Venue**

9.  This Court has jurisdiction under 28 U.S.C. § 1331 and has supplemental jurisdiction regarding plaintiff's state law claims under 28 U.S.C. § 1367.  Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

10.  This Court has jurisdiction under 15 U.S.C. § 1640(e) of plaintiff's claims under the Truth in Lending Act.

11.  This Court has jurisdiction under 15 U.S.C. § 1691e(f) of plaintiff's claims under the Equal Credit Opportunity Act, including under 15 U.S.C. § 1691e(c) of plaintiff's claims for equitable and declaratory relief under that Act.

12.  This Court has jurisdiction under 15 U.S.C. § 1681p of plaintiff's claims under the Fair Credit Reporting Act.

13.  This Court has jurisdiction under 49 U.S.C. § 32710 of plaintiff's claims under the Motor Vehicle Information and Costs Savings Act.

14.  Venue is appropriate in this district for the reason that the pertinent events took place here.

**III Parties**

15.  Plaintiff Mark Allen Todd is a natural person, residing in the City of Allegan in Allegan County, Michigan.

16.  Defendant Midwest Motors is a Michigan domestic profit corporation (ID # 06726T) licensed by the Secretary of State for the State of Michigan to sell motor vehicles at retail  (License # B205732)  and licensed by the Department of Insurance

and Financial Services of the State of Michigan as a motor vehicle dealer originating installment sales contracts to customers purchasing motor vehicles in credit transactions.  As such, Defendant Midwest Motors is licensed by the State of Michigan as an installment seller.  (License # IS-0020232).  By statute, M.C.L. § 445.1539, and as a condition of licensing, Midwest Motors can be served through the Michigan Department of State, Compliance Division, 3rd Floor - Treasury Building, 430 West Allegan Street, Lansing, MI 48918.  Midwest's resident agent for service of process is Donald Miller (one in the same with defendant Donald J. Miller), 1208 M 89, Plainwell, Michigan 49080.  The registered office of Midwest Motors is 1208 M 89, Plainwell, Michigan 49080.

17.  At all times relevant hereto, Midwest engaged in the sale of motor vehicles to customers, regularly extended credit to customers who purchased motor vehicles, and regularly executed retail installment sales contracts subject to a finance charge or payable in four or more installments.

18.  Defendant Donald J. Miller (hereafter "Miller) is an individual residing in the City of Wyoming, Kent County, Michigan and was, at all times relevant hereto, the owner of defendant Midwest Motors.

19.  Defendant Eric R. Rittenhouse (hereafter "Rittenhouse") is an individual residing in the City of Plainwell, Allegan County, Michigan and at all times relevant hereto, the salesman in the transaction underlying this case.

**IV Facts**

20.  On February 27, 2016, plaintiff Mark Todd went to Midwest Motors for the purpose of purchasing a motor vehicle.

6

21.  On that date, Mr. Todd took with him a motor vehicle, a 2002 Jeep Liberty, VIN 1J4GL58K52W2138533, that he then owned and upon which he had an outstanding loan to a third party, intending to trade that vehicle in for the purchase of a motor vehicle from Midwest.

22.  Defendant Rittenhouse showed Mr. Todd a vehicle on the Midwest Motors sales lot that Mr. Todd was interested in purchasing, a 2013 Kia Optima, VIN 5XXGM4A70DG114686.

23.  Defendant Rittenhouse and Midwest requested that Mr. Todd provide information for a credit application, which information Mr. Todd provided.

24.  Defendant Midwest Motors processed the information provided by Mr. Todd and defendant Rittenhouse informed Mr. Todd that he had been approved for credit.

25.  Defendant Midwest Motors, by defendant Rittenhouse, and Mr. Todd signed a retail installment sales contract for Mr. Todd's purchase of the 2013 Kia Optima.

26.  The retail installment sales contract specified the purchase price of the 2013 Kia Optima in the amount of Thirteen Thousand ($13,000.00) Dollars.

27.  The retail installment sales contract provided for a down-payment by Mr. Todd of One Thousand ($1000.00) Dollars, which Mr. Todd made to defendant Midwest Motors.  (True and accurate copes of the Transaction Details printouts are attached hereto, made a part hereof, and labeled Exhibit "A".)

28.  The retail installment sales contract provided for Mr. Todd's making monthly payments, commencing on or about April 3, 2016, in the approximate amount of Three Hundred Seventy-five ($375.00) Dollars to Midwest Motors.

29.  Defendant Rittenhouse and Midwest Motors prepared for Mr. Todd's

signature and Mr. Todd signed Michigan Secretary of State (Form RD-108) Application for Michigan Title and Registration - Statement of Vehicle Sale to transfer title to the 2013 Kia Optima to Mr. Todd pursuant to the retail installment sales contract signed by the parties.

30.   Title and ownership to the 2013 Kia Optima passed to Mr. Todd at the moment the Application for Michigan Title - Statement of Vehicle Sale (Form RD-108) was signed by Mr. Todd on February 27, 2016, without regard to whether the document was ever mailed by defendant Midwest, or delivered by defendant Midwest to the Michigan Secretary of State.  *Perry v. Golling Chrysler Plymouth Jeep, Inc.,* 477 Mich. 62, 65-67 (2007).

31.   Pursuant to the execution of the retail installment sales contract, the payment of the down-payment, the execution of Form RD-108 - Application for Title, and defendant Midwest's, by way of defendant Rittenhouse's assurances to Mr. Todd of, "your car" and "your vehicle" in reference to the 2013 Kia Optima, as the vehicle's owner, Mr. Todd was prepared to, and at all relevant times willing to make the payments on his car to Midwest Motors.

32.   Defendant Rittenhouse removed the license plate from the 2002 Jeep Liberty and affixed the same license plate Mr. Todd's 2013 Kia Optima.  (A true and accurate copy of a photograph of the license plate formerly from the 2002 Jeep Liberty, as affixed to the 2013 Kia Optima, is attached hereto, made a part hereof and labeled Exhibit "B".)

33.   Defendant Midwest Motors and Mr. Todd negotiated as part of the foregoing transaction that Mr. Todd would transfer ownership of the 2002 Jeep Liberty to Midwest,

8

who would, as a condition of assuming ownership, satisfy the debt owing on the Liberty by paying off the lender, CZFC, Inc., 1370 E M89, Otsego, Michigan, in the approximate amount of Five Thousand ($5,000.00) Dollars.

34.  At the behest of defendant Rittenhouse, Mr. Todd signed all of the documents presented him to accomplish the transfer of ownership to defendant Midwest of the 2002 Jeep Liberty and permit Midwest to satisfy the remaining balance owing on the car according to their agreement.

35.  Mr. Todd left Midwest Motors and took his 2013 Kia Optima home, but was given no paperwork from Midwest Motors or any person acting on their behalf, except the VIN of the 2013 Kia Optima written on a yellow post-it note from defendant Rittenhouse that Mr. Todd used to call his insurance agent when he purchased automobile insurance on that car.  (A true and accurate copy of the Declaration provided by Mr. Todd's insurance company reflecting his insurance purchase [loss payee is KALSEE C.U. - See, paragraph 2, *supra*] is attached hereto, made a part hereof and labeled Exhibit "C")

36.  On or about March 5, 2016, a person who identified himself as representing the Finance Department of defendant Midwest Motors appeared at the residence of Mr. Todd and demanded as part of the foregoing purchase of the 2013 Kia Optima that Mr. Todd's mother, Betty Jean Todd, sign the foregoing referenced retail installment sales contract, which demand she obeyed.  Again, as previously, no documents were furnished Mr. Todd or his mother after her execution as a co-signer on the retail installment sales contract.

37.  On or about March 13, 2016, Mr. Todd was notified by defendant

Rittenhouse at Midwest Motors that Mr. Todd had to bring the 2013 Kia Optima that he purchased on March 27, 2016, back to Midwest Motors for the reason that his "credit had been denied" and the financing of Mr. Todd's purchase of the 2013 Kia Optima had "fallen through" for the reason that a third-party finance company to whom Midwest Motors had attempted to sell the retail installment contract did not make loans in the county in which Mr. Todd resided and that Mr. Todd "lived in the wrong county."

38. On March 14, 2016, Mr. Todd received a call from defendant Rittenhouse inquiring about the return of Mr. Todd's car to Midwest Motors.  Mr. Todd informed defendant Rittenhouse that, "Well, you know, I really like the car and I think I'm going to keep it and we're going to abide by the original contract and I'll just bring you in the three hundred and seventy-five dollars at the beginning of the month."

39.  During that telephone call, defendant Rittenhouse indicated to Mr. Todd,

**Defendant Rittenhouse**:  I can call the police station and report my vehicle as stolen. . . . Well actually, I've got the owner of the store right here of the store and he'd like to talk to you about it.

40.  Whereupon, defendant Rittenhouse put defendant Miller on the telephone call to Mr. Todd:

**Defendant Miller**: Mark.

**Mr. Todd**: Yeah.

**Defendant Miller**: Where's my car at?

**Mr. Todd**: We have a, we had an agreement and I'm going to hold you guys to it.
.   .   .

**Mr. Todd**: We signed a contract and you gotta uphold that end of the contract.

10

**Defendant Miller**: I don't think you understand.  You need to talk to an attorney.

.   .   .

**Defendant Miller**: You don't have a licensed vehicle.

.   .   .

**Defendant Miller**: You will never get the title to that car .   .   I haven't processed the title to that car. . .  I have the title sitting right here.  If you'd like me to press charges against you, I will right now. . . . Listen to me, 'Todd' (sic), I do not mess around with thousands of dollars.

**Mr. Todd**: Let me call my attorney.

**Defendant Miller**: You don't have one and I will prosecute you.  So, I will call the police right now.

.   .   .

**Defendant Miller**: Is that what you'd like me to do?

**Mr. Todd**: No, I would not like you to have me arrested.

**Defendant Miller**: Well, that's what's going to happen.  You can't just steal someone's car.

.   .   .

**Defendant Miller**: Can't you just go buy a different car somewhere else?

.   .   .

**Defendant Miller**: You don't have the financing and you don't have cash, so unless you have cash, that is called a breach of contract and I will prosecute you.

.   .   .

**Defendant Miller**: I don't pay your *expletive deleted*-ing bills  . . .

.   .   .

**Defendant Miller**: You don't have any *expletive deleted*-ing cash because if you don't, you don't have a car.  Do you understand that?

41.  Approximately *five minutes* after the conclusion of the foregoing telephone call, defendant Miller again telephoned Mr. Todd:

**Defendant Miller**: Mr. Todd (sic) did you get it figured out yet?

11

**Mr. Todd**: I, uh, contacted my attorney.  He should be calling, calling . . .

**Defendant Miller**: Good, I want you to know this, too.  I just realized you had a loan on that car you traded in.  That's never gonna get paid off.  So just so you know, you're going to get a *repo* (sic) on that as well.  And your license plate hasn't been transferred.  Nothing's been transferred.  You can go . . . you can go get stopped by a cop right now and that car does not belong to you.
.   .   .

**Defendant Miller:** Not only are you putting yourself in (sic) risk, but also [Mr. Todd's mother] Betty, as well, *because you're both on the loan*.  So it's not just you, it's her as well.
.   .   .

**Defendant Miller**:  I just want to remind you of that.  This is Betty, too.  Betty's also going to get prosecuted.
.   .   .

**Defendant Miller**: You and Betty both are going to get prosecuted for this.  This isn't my first time.  There's a lot of people out there.  They're called credit criminals.
.   .   .

**Defendant Miller:** *You* couldn't get the loan.
.   .   .

**Defendant Miller**:  I've already contacted them.  So. . . . I mean, this isn't good.  (laughing)  Unless you move, they know where you live.  Guh!  (laughing)  They have all your information.  It's not like you can hold a car over my head.  (laughing)  Ga-huh!
.   .   .

**Defendant Miller**: I have a lot more money to play with attorneys than you do.

42.  On March 15, 2016, by telephone conversation between Mr. Todd and

defendant Rittenhouse discussed, once again, the reason Midwest Motors gave for

wanting back the car it had sold Mr. Todd.  From that conversation:

**Mr. Todd:** I know you had problems with the financing, and, uh, from what I understand from what you guys told me, it was because I didn't live in a county that they serviced, uh, I'm assuming that, that's correct, right?

**Defendant Rittenhouse**: Right.

43.  Throughout the course of its dealing with Mr. Todd, defendants Midwest Motors, Rittenhouse and Miller, and each of them, misrepresented to Mr. Todd that the retail installment sales contract contained a term or terms conditioning Mr. Todd's purchase of the 2013 Kia Optima upon the assignment of that contract to, or its purchase by, a third party.

44.  The foregoing misrepresentation was material to the purchase by Mr. Todd of the 2013 Kia Optima.

45.  Defendants Midwest Motors, Rittenhouse and Miller misrepresented to Mr. Todd that the reason that defendant Midwest Motors was unsuccessful in selling the retail installment sales contract with Mr. Todd to a third-party investor or investors was that Mr. Todd did not live in a county in which such third-party investor or investors made loans.

46.  The foregoing misrepresentation was material to the credit transaction between Mr. Todd and defendant Midwest Motors.

47.  Defendant Midwest Motors has repeatedly stated that it would not honor the retail installment sales contract with Mr. Todd.

48.  Defendants Midwest Motors, Rittenhouse and Miller refused to process Mr. Todd's paperwork with the Michigan Secretary of State.

49.  On March 17, 2016, defendant Miller followed through on his threat to contact the police and falsely report as stolen the 2013 Kia Optima that had been lawfully purchased from defendant Midwest Motors by Mr. Todd.

50.  Mr. Todd was contacted that same date by the Michigan State Police - District 5, Wayland Post No. 52, and questioned regarding the allegations made by

13

defendants Midwest Motors, Miller and Rittenhouse.  Although the contact was

upsetting to Mr. Todd and his mother, the Michigan State Police declined to take any

further action on the allegations of defendants Midwest Motors, Miller and Rittenhouse.

51.  During the late afternoon hours of Sunday, March 20, 2016, defendants

Rittenhouse and Miller followed through on the threat on behalf of defendant Midwest

Motors to repossess ("repo") the 2013 Kia Optima by taking and removing it from the

residential parking lot in front of Mr. Todd's and Betty Jean Todd's apartment in the City

of Allegan, where they reside.

52.  At that time, Mr. Todd was entitled to exclusive possession of the 2013 Kia

Optima when defendants Rittenhouse, Miller, and Midwest Motors and/or their agents

unlawfully converted the Kia Optima to defendants' Midwest Motors', Rittenhouse's and

Miller's own use.

53.  The defendants and/or their agents took the 2013 Kia Optima in plain view

of Mr. Todd's neighbors, causing Mr. Todd to suffer humiliation and embarrassment.

54.  In taking from Mr. Todd the 2013 Kia Optima automobile, the defendants

and/or their agents deprived Mr. Todd of the use that automobile.

55.  The defendants and/or their agents took Mr. Todd's 2013 Kia Optima

automobile even though Mr. Todd was not in default under the terms of the retail

installment sales contract.

56.  The defendants and/or their agents took Mr. Todd's 2013 Kia Optima

automobile without Mr. Todd's consent and against his express wishes.

57.  The defendants and/or their agents took the 2013 Kia Optima even though

Mr. Todd had communicated to the defendants that Mr. Todd intended to keep that

automobile.

58.  The defendants and/or their agents took the 2013 Kia Optima even though Mr. Todd had communicated to the defendants that he intended to abide by and enforce his contract with defendant Midwest Motors and keep the 2013 Kia Optima.

59.  The defendants and/or their agents took the 2013 Kia Optima from Mr. Todd even though Mr. Todd had communicated to defendant Midwest Motors that he intended to make his monthly payments as agreed in the retail installment sales contract.

60.  That the 2013 Kia Optima was converted to the defendants' own use is reflected in the screenshot of the inventory of Midwest Motors and the motor vehicles it is offering for sale as of Friday, April 1, 2016., a copy of which is attached hereto, made a part hereof and labeled Exhibit "D".

61.  Defendants Midwest Motors, Rittenhouse and Miller directly benefitted and continue to benefit from the conversion of the Kia Optima to their own use as they display and offer for sale the 2013 Kia Optima on the sales lot of defendant Midwest Motors, a corporation owned by defendant Miller and for whom defendant Rittenhouse is employed and sells motor vehicles.

62.  When defendants Midwest Motors, Rittenhouse and Miller converted the 2013 Kia Optima it had a fair market value of Thirteen Thousand ($13,000) Dollars.

63.  Mr. Todd to his detriment relied upon the financial disclosures made by defendant Midwest Motors in the retail installment sales contract.

64.  The unlawful acts of defendants Midwest Motors, Rittenhouse and Miller and each of them, caused Mr. Todd to suffer substantial, actual damages.

65.  Defendant Midwest did not provide Mr. Todd with a timely written statement regarding the dealership's action on his application for credit or with a written statement of the reasons why defendant Midwest Motors denied an extension of credit or alternatively revoked an extension of credit.

66.  Defendant Midwest Motors obtained Mr. Todd's consumer report (commonly known as a "credit report") from one or more consumer reporting agencies and evaluated and assessed the report in connection with the transaction.

67.  One or more of defendant Midwest's employees reviewed and used Mr. Todd's consumer report(s).

**V Claims for Relief**

### Count 1 - Truth in Lending Act (TILA)

68.  Plaintiff Mark Todd incorporates the foregoing paragraphs by reference.

69.  The TILA required defendant Midwest Motors as creditor to disclose as the "amount financed" the amount of credit of which plaintiff Mark Todd as debtor had actual use.  The TILA defines "credit" as "the right granted by a creditor to a debtor to defer payments of debt or to incur debt and defer its payment."  The retail installment sales contract stated a specific "amount financed" in connection with the transaction between defendant Midwest Motors and Mr. Todd.

70.  The TILA defines "creditor" as the "person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness."  15 U.S.C. § 1602(f)(2).  In this case, the retail installment sales contract named Midwest Motors.  Thus, Midwest Motors was the *creditor* in the transaction.

71.  Midwest Motors violated the TILA in its transaction with Mr. Todd because

the retail installment sales contract signed by Mr. Todd and his mother, Betty Jean Todd, and upon which Mr. Todd made his down-payment, had granted Mr. Todd on specified terms as stated in the TILA disclosures contained thereon, when that information was false, inaccurate and misleading because the credit granted by Midwest Motors in the transaction actually was illusory and (at least according to Midwest Motors) conditioned upon Midwest's ability to sell the retail installment sales contract to a third party finance company. Thus, Mr. Todd never had actual use of the credit as represented by Midwest Motors in the TILA disclosures contained in the retail installment sales contract.

72. Midwest Motors violated the TILA in its transaction with Mr. Todd because Mr. Todd was never provided a copy of the retail installment sales contract signed by hm and his mother, Betty Jean Todd, and upon which Mr. Todd made his down-payment.

73. Defendant Midwest Motors violated the TILA by failing to comply with the disclosure requirements of 15 U.S.C. §§ 1631, 1632, and 1638, and Regulation Z, 12 C.F.R. §§ 226.17 and 226.18.

**Wherefore,** plaintiff seeks judgment against defendant Midwest Motors for:

(a) A declaratory judgment that Midwest Motors has violated the TILA;

(b) Actual damages pursuant to 15 U.S.C. § 1640(a)(1);

(c) Statutory damages pursuant to 15 U.S.C. § 1640(a)(2);

(d) Costs of this action, together with a reasonable attorney's fee, pursuant to 15 U.S.C. § 1640(a)(3); and,

17

(e)     Such further relief as the Court deems appropriate.

## Count 2 - Equal Credit Opportunity Act (ECOA)

74.  Plaintiff Mark Todd incorporates the foregoing paragraphs by reference.

75.  Plaintiff is an "applicant" as the term is defined in the ECOA, 15 U.S.C. § 1691a(b).

76.  Defendant Midwest Motors is a "creditor" as the term is defined in the ECOA, 15 U.S.C. 1691a(e).

77.  Plaintiff Mark Todd completed a credit application and applied to Midwest Motors for credit in connection with the purchase of the 2013 Kia Optima from Midwest.

78.  Defendant Midwest denied plaintiff credit and/or revoked plaintiff's credit, which denial and/or revocation constituted "adverse action" as the phrase is defined in the ECOA, 15 U.S.C. §1691(d)(6).

79.  Defendant Midwest Motors failed to provide the plaintiff Mark Todd with a notice of adverse action as required by the ECOA, 15 U.S.C. § 1691(d).

**Wherefore,** plaintiff seeks judgment against defendant Midwest Motors for:

(a)     A declaratory judgment that Midwest Motors has violated the Equal Credit Opportunity Act, 15 U.S.C. § 1691e(c);

(b)     Actual damages pursuant to 15 U.S.C. § 1691e(a);

(c)     Punitive damages in an amount not to exceed $10,000.00, pursuant to 15 U.S.C. § 1691e(b);

(d)     Costs of this action, together with a reasonable attorney's fee, pursuant to 15 U.S.C. § 1691e(d); and,

(e)     Such further relief as the Court deems appropriate.

### Count 3 - Fair Credit Reporting Act (FCRA)

80.  Plaintiff Mark Todd incorporates the foregoing paragraphs by reference.

81.  Plaintiff is a "consumer" as the term is defined in the FCRA, 15 U.S.C. § 1681a(c).

82.  Defendant Midwest Motors is a "person" as the term is defined in the FCRA, 15 U.S.C. § 1681a(b).

83.  Midwest Motors took "adverse action" as the phrase is defined in the FCRA, 15 U.S.C. § 1681a(k), with respect to plaintiff Mark Todd, based in whole or in part on information contained in a consumer report.

84.  Defendant Midwest Motors wilfully failed to provide plaintiff with a notice of adverse action as required by the FCRA, 15 U.S.C. § 1681m, thereby violating 15 U.S.C. § 1681n.  In the alternative, defendant Midwest Motors negligently failed to provide plaintiff with a notice of adverse action as required by the FCRA, 15 U.S.C. 1681m, thereby violating 15 U.S.C. § 1681o.

**Wherefore,** plaintiff seeks judgment against defendant Midwest Motors for:

(a)     A declaratory judgment that Midwest Motors has violated the Fair Credit Reporting Act;

(b)     Actual damages pursuant to 15 U.S.C. § 1681n(a)(1) and/or § 1681o(a)(1);

(c)     Statutory damages pursuant to 15 U.S.C. § 1681n(a)(1);

(d)     Punitive damages in an amount not to exceed $10,000.00, pursuant to 15 U.S.C. § 1681n(a)(2);

19

(e)     Costs of this action, together with a reasonable attorney's fee, pursuant to 15 U.S.C. § 1681n(a)(3) and/or § 1681o(a)(2); and,

(f)     Such further relief as the Court deems appropriate.

### Count 4 - Motor Vehicle Information and Costs
### Savings Act (MVICSA) (Odometer Act)

85.  Defendant Midwest Motors provided no documentation to plaintiff Mark Todd regarding the transfer of the 2013 Kia Optima's and its mileage or odometer reading.

86.  Defendant Midwest Motors is a "dealer" as that term is defined in the Motor Vehicle Information and Costs Savings Act.  49 U.S.C. § 32702(2).

87.  Defendant Midwest Motors performed a "transfer" of the 2013 Kia Optima as the term is defined in the Motor Vehicle Information and Costs Savings Act.  49 U.S.C. § 32702(8).

88.  That defendant Midwest's actions and misrepresentations in failing to provide to plaintiff Mark Todd the necessary disclosures, including that required under the Motor Vehicle Information and Costs Savings Act, constitute "fraud" as the term is defined in the Act.

**Wherefore,** plaintiff seeks judgment against defendant Midwest Motors for:

(a)     A declaratory judgment that Midwest Motors has violated the Motor Vehicle and Costs Savings Act;

(b)     Actual damages;

(c)     Actual damages - trebled, or the greater of three times actual damages or $10,000.00.  49 U.S.C. § 32710(a).

    (d)    Costs and reasonable attorney's fees.  49 U.S.C. § 32710(b).

    (e)    Such further relief as the Court deems appropriate.

### Count 5 - Michigan Motor Vehicle Sales Finance Act (MVSFA)

89.  Plaintiff Mark Todd incorporates the foregoing paragraphs by reference.

90.  Midwest Motors is an "installment seller" and a "seller" as the terms are defined in the MVSFA.  Midwest Motors is a "holder" as the term is defined in the MVSFA.  Plaintiff is an "installment buyer" and a "buyer" as the terms are defined in the MVSFA.

91.  The MVSFA states: "An installment sales contract shall be in writing, and shall contain all of the agreements between the buyer and the seller relating to the installment sale of the motor vehicle sold, and shall be signed by both the buyer and the seller."  M.C.L. § 492.112(a).

92.  The MVSFA states: "An installment sales contract shall not be signed by a party unless it contains all of the information and statements required by this act." M.C.L. § 492.114(a).

93.  The MVSFA states: "An installment sales contract shall not contain a provision by which a buyer waives a right of action against the seller, holder, or other person acting on behalf of the holder for an illegal act committed . . . in the repossession of a motor vehicle . . . ."  M.C.L. § 492.114(d).

94.  The MVSFA states: "No act, agreement or statement by any buyer in any installment sale contract shall constitute a valid waiver of any provision of this act intended by the legislature for the benefit and protection of retail installment buyers of motor vehicles."  M.C.L. § 492.132.

95.  The MVSFA requires that each retail installment contract shall separately disclose the various terms of credit, including the motor vehicle's cash price, amount of down payment, unpaid cash price balance, cost of any insurance or travel emergency benefits procured by the seller, other necessary or incidental costs which the seller contracts to pay on behalf of the buyer, principal amount financed, amount of the finance charge, the time balance and the amount and due date of each payment required.  M.C.L. § 492.113.

96.  Defendant Midwest Motors did not comply with the disclosure requirement of the MVSFA because it represented to Mr. Todd that it had unconditionally guaranteed to him on the terms specified in the RISC, when in fact, and according to Midwest, the information was false, inaccurate and misleading because the granting of credit on the disclosed terms was conditioned upon defendant Midwest's ability to sell the retail installment sales contract to a third-party investor.

97.  Defendant Midwest Motors failed to disclose the finance charge to plaintiff Mark Todd as required by the MVSFA because the purported extension of credit, according to defendant Midwest, was conditional and, therefore, illusory.

**Wherefore,** plaintiff seeks judgment against defendant Midwest Motors for:

(a)    A declaration that Midwest Motors has violated the MVSFA by claiming the extension of credit to plaintiff was conditioned upon Midwest's ability to sell the retail installment sales contract to a third-party investor.

(b)    A declaration that Midwest's claim that it did not extend credit to plaintiff under the terms of the retail installment contract and/or that the extension of credit to plaintiff under the terms of the retail installment sales contract

was conditioned upon a subsequent event, that is, that Midwest's ability to sell the retail installment sales contract to a third-party investor, was unenforceable and a violation of the MVSFA.

(c)     An injunction prohibiting Midwest Motors from further violations of the MVSFA;

(d)     Reasonable costs, attorney's fees, and pre-judgment and post-judgment interest; and,

(e)     Such further relief as the Court deems appropriate.

**Count 6 - Breach of Contract**

98.  Plaintiff Mark Todd incorporates the foregoing paragraphs by reference.

99.  Plaintiff entered into the retail installment sales contract with defendant Midwest Motors with set terms regarding price, financing, payment and possession of the 2013 Kia Optima.

100.  The foregoing contract terms were material to plaintiff Mark Todd.

101.  The retail installment sales contract contained no language making the contract conditional upon Midwest's success in selling the contract to an investor or other third-party.

102.  Alternatively, any alleged agreement between Midwest Motors and plaintiff Mark Todd that contained language making the contract conditional upon Midwest's success in selling the contract to an investor or other third-party was unlawful and unenforceable.

103.  Plaintiff Mark Todd performed all conditions required of him under the retail installment contract.

104. Midwest Motors breached its contract with Mr. Todd.

105. Each breach of the contract was material.

106. Plaintiff Mark Todd has suffered loss as a result of Midwest's breach of contract.

**Wherefore,** plaintiff seeks judgment against defendant Midwest Motors for:

(a)    A declaratory judgment that Midwest's practices constitute a breach of contract;

(b)    Actual damages;

(c)    Exemplary damages;

(d)    Costs;

(e)    Reasonable attorney's fees;

(f)    An order requiring defendant Midwest Motors to repair plaintiff Mark Todd's credit history now that defendant Midwest Motors has followed through upon its "two repossessions" threat and/or caused excessive inquiries to appear in connection with plaintiff's purchase and finance involving the motor vehicles; and,

(g)    Such further relief as the Court deems appropriate.

### Count 7 - Michigan Uniform Commercial Code

107. Plaintiff Mark Todd incorporates the foregoing paragraphs by reference.

108. Defendant Midwest Motors violated Article Nine of the MUCC, M.C.L. § 440.9101, *et seq*., when it took possession of plaintiff Mark Todd's 2013 Kia Optima, contrary to the default and repossession provision remedies of Article 9 of the Uniform

Commercial Code.

109.  Plaintiff Mark Todd suffered loss as a result of defendant Midwest's multiple violations of the UCC.

**Wherefore,** plaintiff seeks judgment against defendant Midwest Motors for:

(a)     A declaratory judgment that defendant Midwest's practices violate the Michigan Uniform Commercial Code;

(b)     Actual damages;

(c)     Statutory damages of an amount of not less than the credit service charge, plus 10% of the principal amount of the debt, or the time-price differential plus 10% of the cash price, pursuant to the MUCC.

(d)     Costs of this action, together with reasonable attorney's fees; and,

(e)     Such further relief as the Court deems appropriate.

**Count 8 - Common Law Conversion and Statutory Treble Damages**

110.  Plaintiff Mark Todd incorporates the foregoing paragraphs by reference.

111.  At all times relevant hereto, plaintiff Mark Todd had the exclusive right to the immediate possession of the 2013 Kia Optima.

112.  Defendants Midwest Motors, Miller and Rittenhouse, and each of them, converted plaintiff's 2013 Kia Optima.

113.  Defendants Midwest Motors, Miller and Rittenhouse, and each of them, knowingly converted plaintiff's 2013 Kia Optima.

114.  Defendants Midwest Motors, Miller and Rittenhouse, and each of them, received and possessed plaintiff's 2013 Kia Optima.

115.  Defendants Midwest Motors, Miller and Rittenhouse, and each of them received and possessed, the 2013 Kia Optima knowing it had been converted.

116.  The conversion of the 2013 Kia Optima was to defendant Midwest's, defendant Miller's, and defendant Rittenhouse's own use.

117.  Defendants Midwest Motors, Miller and Rittenhouse, and each of them, refused to return the 2013 Kia Optima to Mr. Todd.

118.  Defendants Midwest Motors, Miller and Rittenhouse, and each of them, refused to return the 2013 Kia Optima to Mr. Todd, knowing that the automobile had been converted.

119.  Plaintiff Mark Todd has suffered loss as a result of the conversion of the 2013 Kia Optima.

**Wherefore,** plaintiff seeks judgment against defendant Midwest Motors, defendant Donald J. Miller and defendant Eric R. Rittenhouse for:

(a)  A declaratory judgment that each of the defendants' practices constituted conversion of plaintiff Mark Todd's 2013 Kia Optima.

(b)  Actual damages for common law conversion, equal to the fair market value of the vehicle at the time of conversion.

(c)  Treble damages pursuant to M.C.L. § 600.2919a; calculated as three times the fair market value of the vehicle at the time of conversion;

(d)  Costs pursuant to M.C.L. § 600.2919a;

(e)  Reasonable attorney's fees pursuant to M.C.L. § 600.2919a; and,

(f)  Such further relief as the Court deems appropriate.

26

**Demand for Trial by Jury**

Plaintiff demands trial by jury.


Dated: April 4, 2016                           /s/ Anthony J. Valentine
                                               Anthony J. Valentine
                                               Attorney at Law
                                               Attorney for Plaintiff
                                               Ste. 227, 29 Pearl Street, N.W.
                                               Grand Rapids, MI 49503
                                               (616) 288-5410
                                               *tonyvalentinelaw@gmail.com*