UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK ALLEN TODD,

Plaintiff,

v.

Case No. 1:16-CV-340

HON. ROBERT HOLMES BELL

MIDWEST MOTORS SALES & SERVICE,
INC. et al.

Defendants.

_____/

**O P I N I O N**

Plaintiff Mark Allen Todd brings this action against Defendants Midwest Motor Sales & Service, Inc. ("Midwest"), Donald J. Miller, and Eric R. Rittenhouse, alleging violations of federal and state law, including: (1) the Truth in Lending Act (TILA), 15 U.S.C. § 1601 et seq.; (2) the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691a et seq.; (3) the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 et seq.; (4) the Odometer Act, 49 U.S.C. § 32701 et seq.; (5) Michigan's Motor Vehicle Sales Finance Act (MVSFA), Mich. Comp. Laws § 492.101 et seq.; (6) breach of contract; (7) Article Nine of Michigan's Uniform Commercial Code (UCC), Mich. Comp. Laws § 440.9101 et seq.; and (8) conversion.

At the initial scheduling conference on June 20, 2016, Plaintiff indicated that the Michigan Secretary of State had investigated Defendants' conduct and that documents in its possession would likely aid Plaintiff's case. The Court indicated that a settlement conference would be appropriate in this matter and permitted discovery "limited to records of the

Secretary of State." (First Case Management Order, ECF No. 14.) The parties attended a settlement conference and the case did not settle. Before the Court is Defendants' motion for partial summary judgment on Counts I, II, III, IV, V, VII, and VIII of the complaint (ECF No. 16), Plaintiff's motion for partial summary judgment on his conversion claim in Count VIII (ECF No. 17), and Plaintiff's motion for additional discovery (ECF No. 24).

## I.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the moving party carries its burden of showing there is an absence of evidence to support a claim, then the nonmoving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). Where the moving party bears the ultimate burden of persuasion at trial, "the moving party's initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Cockrel v. Shelby County School Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001) (internal quotation marks and citation omitted). "Summary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of

different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

In reviewing a motion for summary judgment, this Court cannot weigh the evidence, make credibility determinations, or resolve material factual disputes. *Alman v. Reed*, 703 F.3d 887, 895 (6th Cir. 2013); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (stating that on a motion for summary judgment "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). "Instead, the evidence must be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party." *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 569-70 (6th Cir. 2012) (citing *Matsushita*, 475 U.S. at 587; *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)). Nevertheless, the mere existence of a scintilla of evidence is not sufficient to create a genuine issue of material fact. *Liberty Lobby*, 477 U.S. at 252. The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the plaintiff. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

Plaintiff opposes Defendants' motion under Rule 56(d), which provides that the nonmoving party can oppose a motion for summary judgment by providing an affidavit or declaration that, "for specified reasons, it cannot present facts essential to justify its opposition[.]" Fed. R. Civ. P. 56(d). In such circumstances, the Court may "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." *Id.* Plaintiff contends that it cannot

respond to the factual assertions in Defendants' motion for summary judgment without further discovery. Rule 56 contemplates entry of summary judgment after "adequate time for discovery." *Celotex*, 477 U.S. at 322. "Typically, when the parties have no opportunity for discovery, denying [a Rule 56(d)] motion and ruling on a summary judgment motion is likely to be an abuse of discretion." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008). In response, Defendants contend that discovery is not necessary because Plaintiff's claims fail as a matter of law or on the record as presented to the Court.

## II.

The following facts are not disputed. On February 27, 2016, Plaintiff visited Defendant Midwest Motors to purchase a vehicle. He selected a 2013 Kia Optima, and agreed to purchase it by trading in his 2002 Jeep Liberty, making a downpayment of $1,000,[1] and then paying off the remainder of the purchase price in monthly installments at an interest rate of 6.25%. Before signing the sales contract, he and his mother submitted a credit application to Kalsee Credit Union ("Kalsee"). As a condition for approval by Kalsee, Plaintiff and his mother were required to apply for a new account with Kalsee, and they did so. Plaintiff's credit application was initially approved.[2] Plaintiff signed the sales contract, made the downpayment, signed an application to transfer title to the Kia from Midwest to

---

[1]The Jeep Liberty was encumbered by a loan of $6,300. Defendants credited Plaintiff $995 for this vehicle and added the remaining balance ($5,305) to the purchase price for the Kia. (Purchase Agreement, ECF No. 16-7.) Defendants allegedly agreed to pay off the remaining balance on the Jeep to the third-party creditor.

[2]Defendants contend that this approval was conditioned upon opening a new account and Plaintiff's eligibility for membership with the credit union.

himself, transferred the license plate from his Jeep to the Kia Optima, turned over the Jeep to Midwest, and then left the dealership with his new vehicle. After Plaintiff left the dealership, Defendants attempted to finalize Kalsee's approval, but Kalsee declined to provide financing. Defendants then attempted to recover the Kia from Plaintiff.[3]

The following facts are alleged in the complaint (ECF No. 1) or stated in Plaintiff's affidavit (ECF No. 18-9). Before Plaintiff left the dealership, he did not receive copies of any of the documents that he signed. Instead, Defendants gave him a Post-it note with the VIN number for the Kia, which he used to obtain insurance. Approximately one week after the sale, someone from Midwest showed up at Plaintiff's residence and asked his mother to sign a new sales agreement. She refused to do so. A week later, Defendant Rittenhouse allegedly contacted Plaintiff and told him to bring the Kia back to Midwest because his "credit had been denied." (Compl. ¶ 37, ECF No. 1.)[4] Defendants allegedly claimed that the sales contract contained a condition requiring Plaintiff to qualify for financing.[5] Plaintiff refused

---

[3]Defendants contend that Kalsee refused to offer financing because Plaintiff and his mother lived in Alleghan County.

[4]This practice is sometimes described as a "spot delivery" or "yo-yo" transaction. "Spot delivery occurs when a buyer and a car dealer sign an installment sale contract for the sale of a motor vehicle and the buyer takes delivery of the vehicle 'on the spot.' The buyer agrees, usually by signing a rider to the contract, that the contract is void if the dealer does not assign it within a certain number of days." Consumer Information 4-11-00, available at http://www.michigan.gov/ documents/cis_ofis_spotdeli_23752_7.pdf (accessed Oct. 17, 2016). Michigan's Department of Insurance and Financial Services has concluded that it is a violation of state law for a dealer to deliver a vehicle under an installment contract and then demand full payment or possession of the vehicle when the dealer determines that it cannot assign the contract to a third party. (*See* Bulletin 2013-08-CF, ECF No. 18-2.)

[5]The contract documents provided by Defendants contain no such condition. (Retail Installment Sales Contract, ECF No. 16-6; Purchase Agreement, ECF No. 16-7.)

their request. Defendants Rittenhouse and Miller then threatened to call the police and to "prosecute" Plaintiff and his mother as "credit criminals," telling Plaintiff that he would never receive the title to the Kia, and that he and his mother's credit history would be damaged because Defendants were not going to pay off the loan on the Jeep. (*Id.* at ¶ 41.) Again, Plaintiff refused. He allegedly told Defendants that he wanted them to honor the sales contract that he had signed.

Not to be thwarted, Defendants made good on their threats by calling the police and reporting that Defendant had stolen the Kia. But the police contacted Plaintiff and declined to take further action. At that point, Defendants decided to take the matter into their own hands. According to an investigation report by the Michigan Secretary of State, two Midwest employees went to Plaintiff's residence, entered the Kia using a spare key, and drove it back to the dealership. (ECF No. 24-2, PageID.336.) Defendants did not return Plaintiff's Jeep. Defendants sent two additional loan applications to Kalsee in Plaintiff's name. (*Id.*) They also submitted an application to the state for a "lost title" on the Kia. (*Id.* at PageID.337.) They did not make payments on the outstanding loan for Plaintiff's Jeep, which was overdue at the time of the state investigation. (*Id.*)

## III.

The primary legal and factual dispute between the parties is whether or not Midwest's sale of the vehicle to Plaintiff was conditioned upon Kalsee's approval. Midwest claims that the sale to Plaintiff was not finalized because Kalsee refused to provide financing. Plaintiff, on the other hand, contends that he entered into a binding agreement with Midwest to

6

purchase the car in monthly installments, and that Kalsee was involved only as a prospective purchaser of that agreement. Plaintiff contends that Midwest did not, and could not, condition the sale of the vehicle upon its ability to sell the agreement to Kalsee, and thus, Midwest could not revoke the sale after Kalsee decided not to finance the transaction. (Alternatively, Plaintiff contends that Midwest failed to inform him that the sale was conditional.) Several of Plaintiff's claims stand or fall depending upon whether the sale was finalized and binding or was conditioned upon Kalsee's approval. The surest way to resolve this dispute is to examine the terms of the sales contract between Plaintiff and Midwest. However, Plaintiff claims that he was not given a copy of this agreement to take with him when leaving the dealership. Moreover, due to the limited discovery allowed by the Court, he has not had an opportunity to obtain copies of all the relevant sales documents from Defendants. Consequently, for the reasons discussed in more detail below, Plaintiff's and Defendants' respective motions for summary judgment will be denied.

**Count VIII: Conversion**

Plaintiff and Defendants both move for summary judgment on Plaintiff's conversion claim under Michigan statutory and common law. Conversion under common law is "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 606 (Mich. 1992). It is not disputed that Midwest exerted control over the Kia when its employees repossessed it. Moreover, some evidence indicates that Plaintiff had a right to the vehicle when Defendants took it from him. A purchase agreement and retail installment sales

contract are attached to Defendants' motion for summary judgment. (Retail Installment Sales Contract, ECF No. 16-6; Purchase Agreement, ECF No. 16-7.) The retail installment sales contract indicates Plaintiff's agreement to purchase the Kia at a specified price, in exchange for his Jeep, a downpayment, and monthly payments of $373.93 to Midwest. (ECF No. 16-6, PageID.215.) It also contains an integration clause, stating that it "contains the entire agreement between [Plaintiff] and [Midwest] relating to this contract," and that "[a]ny change to this contract must be in writing" and signed by the parties. (*Id.* at PageID.216.) This contract contains no provision conditioning the sale of the vehicle on the approval of a financing arrangement with Kalsee or any other third party. Indeed, it refers to Midwest as the "seller - creditor" for the transaction, and it refers to Kalsee as an "assignee" from the seller. (*Id.* at PageID.215-16.)

Similarly, the Purchase Agreement indicates Plaintiff's intent to purchase the Kia in exchange for a downpayment and his Jeep. The portion of the agreement provided by Defendants does not contain any language conditioning the sale on Kalsee's approval, but Defendants have not provided the full agreement to the Court,[6] and they apparently have not provided it to Plaintiff. Moreover, Defendants "deny that [the sales] contract contains no lawful provision conditioning the sale of the vehicle and Midwest's extension of credit upon Midwest's subsequent sale of the contract." (Answer ¶ 4, ECF No. 7.) In addition, Defendants' attorney represented at the initial scheduling conference that "the sale was

---

[6]The Purchase agreement refers to additional terms and conditions on the back of the form; Defendants have not provided the other side of the form.

conditioned upon credit being issued by Kalsee Credit Union." (Rule 16 Tr., ECF No. 23, PageID.310.) Defendants' statements in its answer and at the scheduling conference are not evidence, but they imply that somewhere in the agreement between Plaintiff and Midwest there is a condition that the sale depended upon approval by Kalsee. At this stage of the proceedings, before production of all the relevant sales documents has occurred, the Court cannot say that no reasonable juror would deny that Plaintiff was entitled to possess the vehicle and that Defendants improperly interfered with this right. Thus, the Court will not grant summary judgment in favor of Plaintiff.

Defendants contend that they are entitled to summary judgment because Plaintiff's conversion claim is barred by the "economic loss doctrine." This doctrine's "basic premise is that economic losses that relate to commercial transactions are not recoverable in tort." *Quest Diagnostics, Inc. v. MCI WorldCom, Inc.*, 656 N.W.2d 858, 861 (Mich. Ct. App. 2002). "[T]ort claims are barred under the doctrine only where the duty alleged to have been violated by the defendant is implicated by the relevant contract." *Tyson v. Sterling Rental, Inc.*, Nos. 15-1465/1468, 2016 WL 4578642, at *9 (6th Cir. Sept. 2, 2016). At this stage of the proceedings, however, the nature of the contractual relationship between Plaintiff and Midwest is unclear. As indicated, Plaintiff has not had an opportunity to discover all the relevant terms of the sales transaction. Accordingly, the Court will not grant Defendants' motion insofar as it relies on the economic loss doctrine.

Defendants further contend that Plaintiff's common-law conversion claim fails because Midwest has offered to return the Kia and Plaintiff has refused. Defendants assert

that a conversion claim requires finding that Plaintiff made a legal demand for the vehicle and that Defendants refused to deliver it. However, what Defendants describe is only one of the ways in which a conversion can occur. *See Aroma Wines & Equip., Inc. v. Columbian Distrib. Servs., Inc.*, 871 N.W.2d 136, 144 (Mich. 2015). Conversion can occur by "'refusing to surrender a chattel on demand,'" or by "'intentionally dispossessing another of chattel[.]'" *Id.* (quoting *Thoma v. Tracy Motor Sales, Inc.*, 104 N.W.2d 360, 362 (Mich. 1960)). Plaintiff alleges the latter.

Defendants also contend that Plaintiff's claim for *statutory* conversion fails because Plaintiff has not alleged that Defendants converted the Kia "to [their] own use." *See* Mich. Comp. Laws § 600.2919a(1)(a). According to Defendants, the Kia could not have been converted to their use because they have offered to return it and it is now available for use by Plaintiff. There is no evidence supporting Defendants' assertion that they offered to return the Kia to Plaintiff. Moreover, Plaintiff has offered evidence that Defendant put the Kia back up for sale on Midwest's lot. Because Plaintiff has not had the opportunity to obtain discovery on this issue, the Court will not grant summary judgment in Defendants' favor.

Finally, Defendants contend that Plaintiff has not sustained any damages because Defendants have offered to return the Kia, and any damages are the result of his refusal to accept its return. Again, this contention is unsupported, and because Plaintiff has not been able to obtain discovery, the Court reserves judgment on the issue of damages. In short, the

Court will deny Plaintiff's motion for summary judgment and Defendants' motion for summary judgment as to Count VIII of the complaint.

Defendants also move for summary judgment on Counts I, II, III, IV, V, and VII of the complaint.

**Count I: Truth in Lending Act (TILA)**

Count I of the complaint alleges that Defendant Midwest was required to disclose the amount of credit to which Plaintiff had actual use. Plaintiff claims that if the sales contract was conditioned upon Midwest's sale of the agreement to a third party, then the credit disclosed to him was "illusory," and Plaintiff never had "actual use" of it. (Compl. ¶ 71, ECF No. 1.) Plaintiff also contends that Midwest violated the TILA by failing to provide him with a copy of the retail installment sales contract.

The TILA requires creditors to disclose the cost of credit "before credit is extended." 15 U.S.C. § 1638(b). Those disclosures include the identity of the creditor, the amount financed, the finance charge, the annual percentage rate, the total of payments, and the total sale price. 15 U.S.C. § 1638(a); 12 C.F.R. § 226.18. The implementing regulations further explain that the disclosures must "reflect the terms of the legal obligation of the parties," 12 C.F.R. § 226.17(c)(1), and must be given before the "consumer becomes contractually obligated on a credit transaction," 12 C.F.R. § 226.2(a)(13).

Defendants argue that the TILA does not apply because no credit transaction was actually consummated between Plaintiff and Kalsee. However, the relationship between Plaintiff and Kalsee is not the focus of Plaintiff's complaint. Plaintiff alleges that a credit

11

transaction was consummated between Plaintiff and *Midwest*. Thus, Defendants' first argument is not relevant to this case.

Next, Defendants argue that Midwest did not violate the Act because the disclosures that it provided were accurate at the time that they were made. The retail installment sales contract discloses the annual percentage rate, the finance charge, the amount financed, the total of all payments to be made, the number of payments, the amount of the monthly payment, and the date when the first payment was due. (ECF No. 16-6, PageID.215.) Plaintiff has not identified any error in these disclosures. Instead, Plaintiff claims that the nature of the credit offered by Midwest was "illusory" if, in fact, it was conditioned upon approval by Kalsee. This claim depends upon an issue in dispute, i.e., whether Midwest was obligated to extend credit to Plaintiff when the sale became final, or whether any credit offered by Midwest was conditioned upon Kalsee's approval. If Midwest was bound by the terms of an installment contract even though Kalsee declined to finance it, the credit offered by Midwest was not illusory. *See Williams v. Delamar Car Co.*, No. 1:11-CV-26, 2011 WL 1811061, at *3 n.2 (W.D. Mich. May 12, 2011) (discussing a similar claim). Plaintiff deserves an opportunity to probe Defendants' assertion that the sale was not finalized.

Moreover, Defendants have not addressed Plaintiff's separate allegation that Defendants failed to give him a copy of the written disclosures. TILA requires creditors to provide a copy of the document containing the disclosures. *See* 12 C.F.R. § 226.17(a)(1) (requiring the creditor to make the disclosures "in a form that the consumer may keep"); *see also Gillom v. Ralph Thayer Auto. Livonia, Inc.*, 444 F. Supp. 2d 763, 769 (E.D. Mich. 2006)

(interpreting 12 C.F.R. § 226.12(a)(1) to require a dealer to not only show the disclosures to the purchaser, but also to provide a copy of the disclosures to the purchaser); *Lozada v. Dale Baker Oldsmobile, Inc.*, 197 F.R.D. 321, 337-38 (W.D. Mich. 2000) (same) (citing cases). Consequently, summary judgment as to Count I will be denied.

### Count II: Equal Credit Opportunity Act (ECOA)

The ECOA prohibits creditors from discriminating against any credit applicant "with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex, or marital status." 15 U.S.C. § 1691(a)(1). The ECOA also contains notice requirements for creditors, providing that an applicant for credit "against whom adverse action is taken shall be entitled to a statement of reasons for such an action from the creditor." 15 U.S.C. § 1691(d)(2). A "creditor" is a "person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e). An "adverse action" means "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." 15 U.S.C. § 1691(d). An "aggrieved applicant" may bring a civil action against "[a]ny creditor who fails to comply with any requirement imposed under [the Act]." 15 U.S.C. § 1691e(a).

Midwest does not deny that it is a "creditor" under the ECOA because it regularly refers customers to lenders like Kalsee. However, Midwest contends that it is not liable under

the ECOA for any failure to provide notice of an adverse action, because its only role was to refer Plaintiff to Kalsee. Some courts have held that an entity that merely refers applicants to lenders, and does not play any role in setting the terms of the credit arrangement, "is a 'creditor' under the ECOA only for purposes of 12 C.F.R. § 202.4(a) (discrimination) and (b) (discouragement)." *Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 979 (7th Cir. 2004) (citing 12 C.F.R. Pt. 202, Supp. I). In other words, "there is 'a continuum of participation in a credit decision from no participation, to referring applicants to the decision maker, to final decision making. At some point along the continuum, a party becomes a creditor for purposes of the notification requirements of the Act." *Id.* at 980 (quoting *Bayard v. Behlmann Auto. Servs., Inc.*, 292 F. Supp. 2d 1181, 1186 (E.D. Mo. 2003)). Elaborating on comments to the regulatory definition of "creditor," the Federal Reserve Board has stated:

> Some industry commenters expressed concern that the clarification would include in the definition of creditor persons without discretion to decide whether credit will be extended. The Board recognizes that in the credit application process persons may play a variety of roles, from accepting applications through extending and denying credit. Comment 2(1)–2 is intended to clarify that where the only role a person plays is accepting and referring applications for credit, or selecting creditors to whom applications will be made, the person meets the definition of creditor, but only for purposes of the prohibitions against discrimination and discouragement. For example, an automobile dealer may merely accept and refer applications for credit, or it may accept applications, perform underwriting, and make a decision whether to extend credit. *Where the automobile dealer only accepts applications for credit and refers those applications to another creditor who makes the credit decision*—for example, where the dealer does not participate in setting the terms of the credit or making the credit *decision—the dealer is subject only to §§ 202.4(a) and (b) for purposes of compliance with Regulation B*.

*Id.* at 979-80 (quoting 68 Fed. Reg. 13155) (emphasis added).

14

At this stage of the proceedings, Midwest's role is unclear. Plaintiff deserves an opportunity for discovery to ascertain Midwest's role with respect to the credit offered by Kalsee. If, for instance, Midwest was able to set any of the terms of the credit offered by Kalsee, then it might be bound by the notification requirements of the ECOA. Plaintiff indicates that Defendants have not responded to requests for documentation of any arrangements between Midwest and Kalsee, and Plaintiff has not been given an opportunity to investigate the matter.

**Count III: Fair Credit Reporting Act (FCRA)**

Like the ECOA, the FCRA also contains notification requirements. It requires that "[i]f any person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report, the person shall provide oral, written or electronic notice of the adverse action to the consumer." 15. U.S.C. § 1681m(a). Midwest contends that it took no adverse action with respect to Plaintiff; it was Kalsee who denied Plaintiff's credit application. Midwest further claims that, even if Kalsee's actions could be "imputed" to Midwest, the denial of Plaintiff's credit application was based on his place of residence, not his credit history. (Defs.' Mot. for Summ. J. 11, ECF No. 16.)

Plaintiff asserts that it cannot respond to these assertions because Defendants have refused to provide documentation of the information that Midwest sent to Kalsee or the basis for Kalsee's decision. Similarly, as noted with respect to Count II, Plaintiff has not had an opportunity to obtain discovery on Plaintiff's role in the credit decision. Thus, this claim cannot be resolved without further discovery.

**Count IV: Odometer Act**

Plaintiff alleges that Defendants failed to provide him documentation regarding the transfer of the Optima and its mileage or odometer reading. The Odometer Act requires a person transferring ownership of a motor vehicle to provide written disclosure of the mileage registered on the odometer. 49 U.S.C. § 32705(a)(1)(A). Defendants contend that the odometer reading was disclosed on the retail installment sale contract (ECF No. 16-6), the purchase agreement (ECF No. 16-7), and an odometer disclosure statement (ECF No. 16-8), all of which were signed by Plaintiff. Plaintiff acknowledges that he signed the agreement which contains the odometer reading. (Pl.'s Aff. ¶ 7, ECF No. 18-9.) However, Plaintiff avers that he did not receive a copy of this agreement, or any other paperwork other than the Post-it note with the VIN number. (*Id.* at ¶ 9.) Like the TILA, the Odometer Act appears to require more than just the disclosure of information; it appears to require that the transferor of a vehicle give the transferee a copy of the document containing the disclosures. The statute provides that the transferor must "give" a "written disclosure." 49 U.S.C. § 32705(a)(1). Similarly, the regulations provide that the transferee of a vehicle must sign the disclosure statement and return "a copy" to the transferor, which implies that the transferee must be able to retain a copy. 49 C.F.R. § 580.5(f). Thus, construing the evidence in Plaintiff's favor, a question of fact remains as to whether he received the proper disclosure required by the Odometer Act.[7]

---

[7] Plaintiff must also show that Defendants acted "with intent to defraud," 49 U.S.C. § 32710(a), but that issue is not before the Court.

### Count V - Michigan Motor Vehicle Sales Finance Act (MVSFA)

Plaintiff contends that Defendant violated the MVSFA, Mich. Comp. Laws § 492.101 et seq, by failing to disclose that the sales contract was conditioned upon Midwest's ability to transfer the purchase agreement to a third party. Defendants contend that Plaintiff does not state a claim because the MVSFA does not permit a civil remedy. In *Lozada*, the case on which Defendants rely, the court noted that the MVSFA "contains a broad criminal penalty section for all willful violations of the act, which authorizes criminal sanctions, including imprisonment and fines . . . [but] the legislature intended that the act would be largely enforced criminally and did not intend expansive civil penalties unless specifically authorized by other provisions." *Lozada v. Dale Baker Oldsmobile, Inc.*, 136 F. Supp. 2d 719, 726 (W.D. Mich. 2001). But *Lozada* did not rule out the possibility of a damages remedy under the MVSFA; it merely held that the plaintiff could not recover finance charges as a result of a violation of Mich. Comp. Laws § 492.112(c). *Id.* at 727. At least one other court has indicated in *dicta* that another provision of the MVSFA, Mich. Comp. Laws § 492.131, authorizes damages for "prohibited charges." *Schultz v. Burton-Moore Ford, Inc.*, No. 07-13932-BC, 2008 WL 5111897, at *7 (E.D. Mich. Dec. 2, 2008). In any event, Plaintiff does not seek damages for this claim. He seeks declaratory and injunctive relief. (Compl. ¶ 97.) Defendants do not explain why such relief would not be allowed. Consequently, the Court will not grant summary judgment on this claim.

### Count VII - Michigan Uniform Commercial Code (UCC)

Plaintiff alleges that Defendant Midwest violated the default and repossession remedies of the UCC, Mich. Comp. Laws § 440.9101 et seq., when it regained possession of the Kia Optima. Defendants contend that the UCC does not apply because the applicable provision in the UCC, Mich. Comp. Laws § 440.9611, applies to a "secured party" who disposes of collateral. Defendants contend that Midwest was not a secured party because a "notice to cosigner" signed by Plaintiff and his mother lists Kalsee as the lienholder. (ECF No. 16-12.) But this evidence contradicts the retail installment sales contract, which lists Midwest as the "creditor" and gives Midwest the right to repossess the vehicle if Plaintiff fails to make timely payments under the agreement. (ECF No. 16-6, PageID.217.) Moreover, Kalsee could not have been a secured party if, as Defendants claim, no transaction was consummated between Plaintiff and Kalsee.

Defendants cite *Gillom*, in which the court concluded that the dealer never became a secured creditor and was, therefore, not covered by Michigan's UCC. *Gillom*, 444 F. Supp. 2d at 774. *Gillom* does not clearly explain why the dealer in that case did not become a secured party, though it may be because the dealer rescinded the purchase agreement before the plaintiff made any payments on it and before the title transferred to the plaintiff. *Id.* at 773-74. In contrast, it is not disputed that Plaintiff made a downpayment for the Kia. On the other hand, it is not clear whether title in the Kia transferred to Plaintiff, or whether Defendants could have rescinded the sales contract. Thus, *Gillom* may be distinguishable, but further discovery is necessary to resolve these factual issues. Consequently, Defendants' motion for summary judgment will be denied.

## IV.

For the reasons stated, the Court will deny Plaintiff's and Defendants' respective motions for summary judgment. The Court will grant Plaintiff's motion under Rule 56(d) insofar as Plaintiff seeks an opportunity for further discovery.

An order consistent with this opinion will be entered.


Dated: October 24, 2016	/s/ Robert Holmes Bell
	ROBERT HOLMES BELL
	UNITED STATES DISTRICT JUDGE